## Case No. 8,594.

### LUCO et al. v. UNITED STATES.

[1 Hoff. Land Cas. 345.] [1]

District Court, N. D. California. June Term, 1858. [2]

MEXICAN LAND GRANT—FRAUDULENT.

The claim rejected on the ground that the alleged grant is fraudulent and antedated.

Claim for [the Rancho Ulpines] a tract of land, quantity unknown, in Solano county, rejected by the board, and appealed by the claimants [Juan M. Luco and José Leandro Luco].

Calhoun Benham, for appellants.

P. Della Torre, U. S. Atty., for appellees.

HOFFMAN, District Judge. The claim in this case is for a tract of land of from thirty to fifty square leagues in extent, constituting a sobrante, or surplus, between various

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]
[2] [Affirmed in 23 How. (64 U. S.) 515.]

ranchos mentioned in the title. It was rejected by the board as spurious. The testimony is very voluminous. I have considered it with the attention due to its importance. The claimants have offered in evidence a paper purporting to be the original petition of José de la Rosa to the governor, dated October 18th, 1845, with a marginal decree of the latter, dated November 8th, 1845. Also the original grant, signed by Pio Pico, José Ma. Covarrubias, secretary, dated December 4th, 1845, with a certificate of approval by the assembly, signed by the same persons, and dated December 18th, 1845. These papers are not produced from the archives of the former government, but were deposited in the surveyor general's office on the twenty-fifth of October, 1853, by the claimants. No claim was presented to the board within the time limited by the act of 1851. An application was therefore made to congress, and a special act was passed July 17th, 1854, authorizing the presentation of the claim. This application was based upon the affidavits of Pio Pico and José Maria Covarrubias, which will hereafter be noticed. It is contended, on the part of the United States, that all the papers in the case are spurious, and were fabricated long after the conquest of the country. In deciding upon the genuineness of any title alleged to have been derived from the former government, the most satisfactory evidence which can be offered to the court is that derived from the archives, and that afforded by a notorious occupation, and a claim of ownership recognized and acquiesced in, if not by the public authorities, at least by the neighbors and adjoining proprietors of the alleged grantee.

In the case at bar, the archives show no trace whatever of the existence of the grant. The petition and marginal decree are presented by the claimants from their own custody. No proofs are offered to explain why the claim was not sooner presented to the board, nor where or in whose custody the documents have been since their alleged delivery to the grantee. The affidavits on which the application to congress was founded were made in May and June, 1853. It is clear that neither to Pico nor Covarrubias was the original petition presented. In his deposition, taken before the board, Covarrubias states that all the documents presented to him, when he made his affidavit, are, he believes, referred to in the affidavit; and that as well as he can recollect, all the documents about which he was then testifying were presented to him. He is not very positive, however. He remembers that the expediente was shown to him. Had the witness before testifying adverted to the affidavit itself, he would have seen that he therein swears that, "he (De la Rosa) presented a written petition for said grant of land, but the affiant does not know where said petition now is. The practice with the office was to return the petition with the grant." It will hardly be

contended that the petition was before Covarrubias when he made this affidavit. The affidavit of Pico refers exclusively to the "original document hereunto annexed, bearing date December 4th, 1845"—which was the grant. Mr. Haight, who was consulted by the claimants as counsel, testifies that he saw, in 1853, the original document, that is, the grant; but is not positive as to the others, and that "the claimants represented to him that there were other papers in Mexico, which they would endeavor to get." It is evident, therefore, that so late as the beginning of 1853 the petition had not been brought to light. It is also obvious, from the tenor of the affidavits of Pico and Covarrubias, that the certificate of approval by the assembly was not exhibited to them when their affidavits were taken. The affidavit of Covarrubias refers exclusively to the grant. Neither Mr. Haight nor Mr. Hawes pretend to have seen the certificate. It is produced for the first time in October, 1853, when it was deposited in the surveyor general's office. No explanation whatever of these circumstances is offered by the claimants, nor has any attempt been made to show how it happened that the petition and certificate became separated from the grant; how they, or at least the former, found its way to Mexico; in whose custody they were found, and when, and from whom and under what circumstances the person in possession of them procured them.

M. G. Vallejo, one of the principal witnesses relied on by the claimants, testifies that in the month of December, 1845, he received from the governor, by a courier, the grant, which he delivered to Rosa. It was in an envelope which the latter opened, and the witness saw and read it. In reply to the sixth cross-interrogatory, he states that the grant was the only paper received by him, and that he did not see the others. He also states that he never saw the certificate of approval, until he saw it in the surveyor general's office; that he saw the petition when Rosa drew it, but that he does not know that Rosa had the petition after he received the grant. To the twenty-second cross-interrogatory, he replies that he never saw the petition and approval attached together until he saw them in the surveyor general's office. José de la Rosa, the grantee, testifies that he drew the petition in 1845, and that in the latter part of that year he received it back again with the title. That the title was delivered to him by M. G. Vallejo in December, 1845, and that the certificate of approval was delivered to him by Vallejo subsequently, in the year 1846—in January or February of that year. The credibility of the testimony of either of these witnesses will be considered hereafter. It is sufficient at present to say that neither pretends to account for the papers after their alleged reception by Rosa in 1845 and 1846. No inquiry was made of the latter as to whether he retained them in his

custody; why he did not while the property remained his—that is, up to March 18th, 1853—present his claim to the board; whether at the time of the transfer he delivered the papers to the present claimants, or if not—whether as stated by them to their counsel, Mr. Haight, about the same time—they were then in Mexico, and if so in whose custody, and for what reason sent. In a case where the chief inquiry is whether the papers be genuine, information on these points ought not to be withheld. We have seen that José Maria Covarrubias, in his affidavit in 1853, states it to have been "the practice with the office to return the petition with the grant." This extraordinary statement is not only disproved by the notorious fact that the expedientes containing the petition, informes, orders and concession, were usually retained in the archives where they are now found—the grant or titulo being the only document delivered to the party—but it is contradicted by the evidence of M. G. Vallejo, and by the testimony of Covarrubias himself. In his answer to the sixty-second cross-interrogatory he says: "The petitions and the balance of the expedientes were archived in the archives of the government. This was the general practice before, while, and after I was secretary."

It is to be regretted that the sense of the necessity of accounting for the absence of the petition from the archives, which may have suggested the statement of Covarrubias in his affidavit, did not lead the claimants then or since to offer a more satisfactory explanation of the circumstance. The claimants can thus derive no aid to their documents from any presumptions of genuineness which might have arisen from their production from the proper custody. On the contrary, they are liable to the suspicions which their long delay in presenting them, and their entire failure to explain circumstances so clearly requiring and so easily admitting of explanation (if the papers are genuine) naturally excite. Evidence has been offered to show an occupation by Rosa of the land said to have been granted to him. The witnesses on this point are Alvarado, Victor Prudon, Mesa, Salvador, Vallejo, Carillo, Juarez and Ortega. Alvarado swears that in 1849, Rosa told him in San Francisco, that he was occupying a rancho near Sonoma. Victor Prudon testifies that in 1840 he knew Rosa to be in the occupation of a rancho called Julpines; that he had a house and corral on it, and that he remained there until 1846. The witness, on his cross-examination, admits that he never was on the rancho; that he knew of Rosa's occupation "from General Vallejo and common report," and from his sending goods to the place by Rosa's order, or that of his major domo. Mesa testifies that he knew Rosa to be living on and occupying a rancho in Solano county, long before the Americans came to the country; that he had an adobe house on the place, in which he lived with his family. He had a corral and horses, and some cultivation. That he visited Rosa at his house while he lived there. That he saw Rosa building the house, and that the cultivation was about one hundred varas square. Salvador Vallejo swears that he knows Rosa has occupied the place ever since he obtained the grant—that is, in 1845 or 1846. That he had a house and corral. horses and cattle there, and a portion of the land inclosed and cultivated. That Rosa lived there with his family, but at times during the period he has resided at Napa, Sonoma and Monterey. On cross-examination he states that he knows Rosa has continued to occupy the land, for it is on the road to Sacramento, and he, the witness, has frequently seen it in passing that way. José Ramon Carillo testifies that he has frequently stopped at Rosa's house on the Rancho of Ulpines; that Rosa was living there with his family; that he had horses and cattle on it, and had erected a corral. The house was an adobe. That Rosa was still on the place when he (witness) left Sonoma two or three years after the Bear Flag war—that is, 1848 or 1849. Cayetano Juarez testifies that he was in Rosa's house on the rancho in 1845; that it was built of poles, covered with board and tules; that it was near an estuary of the river; that it could not possibly have been seen from the road to Sacramento, it being eight or ten leagues distant; that there were eight or ten acres cultivated in wheat; that the house was situated about eight leagues from the road running from Sonoma to Sacramento; that on one occasion he lent him horses and carts to take his family to the rancho; that he had lent him horses on several occasions; that the cultivated land was not fenced, but appeared to have been plowed. Ortega swears that in 1838 he saw on the land a house, built of poles and plastered with mud; that it was situated on the right hand side of the road as you go from Sonoma to Sacramento, about seventy varas from the estero; that he stopped there on his way to Sacramento, and that he saw the house from the traveled path before he turned off to go to it. There was no wagon road to it, but numerous paths made by cattle and elk. José de la Rosa, the grantee, testifies that he occupied the land; that he kept his wild horses upon it during the year 1846; that they were three or four hundred in number, and marked with his brand, of which he gives a rough drawing. The tame horses, about fifty in number, he kept at Sonoma. That in 1845 and 1846, he frequently visited his ranch with his family; but "he always went with his own horses—he never had horses belonging to any one else." Salvador Vallejo testifies. in a second deposition, that he conveyed De la Rosa in his launch the first time he went to occupy Ulpines. That a house was built under his and witness' di-

rections, and was built of poles and mud, and roofed with boards. That a piece of land was inclosed and cultivated there, and that the cattle on the rancho were owned by Rosa, but branded with the mark of M. G. Vallejo. M. G. Vallejo states, in a general way, that he knows that De la Rosa occupied the rancho. He admits, however, that he never was on it after Rosa received his grant.

The foregoing comprises all the testimony adduced by the claimants to prove occupation by De la Rosa of the land. It is apparent that the witnesses contradict each other on several material points. As to the extent of the cultivation, as to whether or not it was fenced, as to the material of which the house was composed, as to the brand upon the cattle, and especially as to the situation of the house, whether it was near to and visible from the road, or eight or ten leagues distant. The statement of one of the witnesses that he frequently lent horses and carts to De la Rosa is inconsistent with the declaration of the latter that he always used his own horses in going to his rancho, while the frequent voyages in the launch, as described by Vallejo, seem wholly to have escaped the recollection of De la Rosa. It is unnecessary, however, to dwell on these contradictions, for the alleged occupation by Rosa of the land has been disproved by what I cannot but consider a clear preponderance of testimony. It is in evidence that up to 1853, the lands were treated by the United States as public lands, and surveyed as such. Felipe Peña, one of the original grantees of the adjoining rancho of Los Putos with Baca, states that Rosa never built a house upon or occupied the rancho; that he is acquainted with the rancheros in that region, and never knew Rosa to be the proprietor or owner of any land. Demetrio Peña makes the same statement. John Bidwell, the original grantee of "Elichama," and who was acquainted with all the rancheros in that part of the country, states that the premises claimed in this case were never occupied or cultivated by any one to his knowledge, and that had De la Rosa lived on the rancho he thinks he should have known it. José S. Berreyesa, who was alcalde of Sonoma in 1846, states that he was asked by Don Agustin Bernal if he would report favorably to his (Bernal's) petition for the land, whether it was vacant and could be granted; to which he replied that it was vacant and unoccupied, and that so far as he (Berreyesa) was concerned, there would be no obstacle to the grant. S. Cooper testifies that he was acquainted with all the rancheros in the neighborhood in 1846, and ever since; that he never heard of Rosa's having a grant; that there was no adobe house upon it. That he was assessor during the first two years California was a state; that all the ranchos were given in to be assessed

except one—but this rancho was not given in by any one, and was not taxed. William Denton testifies that in 1852 and 1853, as county surveyor, he inquired of all the old rancheros in the neighborhood, and that from the information so obtained, he certified this land to be public land. That he has been conversant with the whole tract of country since 1852, and never saw any evidence of any old Spanish improvements on this land, or heard of any. E. F. Elliott testifies that in the spring of 1846, Rosa moved into the same house with himself, and purported to be a school teacher; that he had no property, and since the war he has followed the business of a tailor, and sometimes worked in General Vallejo's vineyard. The witness further states that he was personally acquainted with the whole neighborhood, and worked in every rodeo; that his business was killing cattle for their hides and tallow, and that Rosa did not have, during the years 1846, 1847, 1848 and 1849, cattle to the number of from three hundred to five hundred, the same number of horses, or any less number, nor could he have had them without the witness' knowledge. That he never saw the brand delineated by Rosa on any cattle; that he would have seen it had it been there. The witness gives from memory some sixteen brands which were upon cattle in the neighborhood. He further states that he has heard Rosa frequently complain of his poverty, but never heard him speak of having any property. Elmsley Elliott swears to nearly the same facts. He states that Rosa's family has often come to his father's house begging for something to eat; that he has traveled all over the country, and has never heard of Rosa's owning the stock described by him; that Rosa has told him more than twenty times, from 1845 to 1849, that he did not own any such. John Cameron, a witness for the claimants, who has resided in Sonoma from April, 1847, until March, 1854, stated that he never knew Rosa to be the owner of any number of horses and cattle. That he was acquainted with all the brands used from Sutter's to San Rafael, and he never had any pointed out to him as Rosa's brand; that he was generally supposed to be a very poor man.

It is unnecessary to recapitulate all the evidence on this point. A careful perusal of it has led me irresistibly to the conclusion that it is not proved that Rosa either occupied, built upon or cultivated this rancho. From the whole testimony in the case, as well on the part of the claimants as of the United States, it clearly appears that up to the latter part of 1844, Rosa's residence was in Monterey, where he was employed as printer. That in 1844, or the beginning of 1845, he came to Sonoma, where he resided with his family until after the conquest; that he was poor, and obtained his livelihood by mending clothes and watches, and

similar occupations. From 1846 to 1848, it is stated by one of the claimants' own witnesses, (J. P. Leese) that he lived with General Vallejo, to whose children he taught music, and that Vallejo, from charitable motives, gave him an opportunity to support himself. Since the organization of the board of commissioners, he is stated by one of the witnesses to have added to his ordinary business as a tailor, the more profitable profession of testifying in land cases. No one can read the depositions of the numerous witnesses who testify as to his continued residence in Sonoma, as to his circumstances and means of livelihood, and avoid the conviction that his statement as to the occupation of the rancho, his ownership of fifty tame and three or four hundred wild horses, etc., is incredible. To all this may be added the repeated declarations of Rosa, that he never owned a rancho, and had never applied for one. This last evidence, however, is met on the part of the claimants by that of George C. Yount and Narciso Botello. The first of these witnesses swears that sometime in 1846, Rosa told him he had a rancho, and to the best of his (witness') belief, stated that it lay between Baca and Bidwell's ranch, and was called Pulpones or Pulpines. Narciso Botello swears that he remembers that while a member of the assembly he heard some talk of an application by Rosa for a grant in Sonoma; that he does not know whether he ever obtained the grant, nor was he informed of the fact until he recently saw the papers exhibited by the claimants. The circumstance stated by Botello may perhaps explain the testimony of Mr. Yount. It may be that Rosa did endeavor to obtain a grant, or that "there was some talk about it," and he may have stated that fact to Mr. Yount. At all events, I do not feel at liberty to receive this testimony of an isolated declaration as outweighing the evidence of so many witnesses, who testify as to his residence, his mode of life, his means of livelihood, and his repeated declarations that he owned no rancho whatever. Having thus seen that no evidence of the authenticity of this grant is afforded by the archives of the former government, nor by the production of the documents from the proper custody, nor by proof of an occupation of the land, we proceed to consider the evidence as to the genuineness of the signatures.

A large number of witnesses testify, on the part of the claimants, that in their opinion the signatures of Pio Pico are genuine. On the part of the United States, several witnesses testify that they believe them to be forgeries; and one of them expresses the opinion that they were written by the person who wrote the body of the instrument— that is, by Covarrubias. It is admitted by all the witnesses for the claimants that the signatures of Pico in these documents are unlike his usual mode of writing his name, although it is stated by them that his mode of signing his name was not uniform. The deposition of Pico himself has been taken since the case was appealed, but a traced copy of the grant, and not the original, was submitted to him. The testimony of Pico is singularly guarded. He says he cannot now remember in regard to the original document, "but the signature as it appears in the traced copy appears to be my signature, and I believe my signature was placed to the document at the time it bears date." He repeats totidum verbis the same answer to three successive interrogatories. To the seventh interrogatory he answers: "I do not now remember of the grant of land mentioned in the interrogatory, except from the papers shown me, and therefore cannot state further in regard to it." In answer to the first cross-interrogatory he says: "My statement in regard to my signature is made from inspection of the papers now presented to me, and not from recollection of signing the originals. I believe, however, from my best recollection, that the original documents were signed by me at the time they bear date." To the second cross-interrogatory he says: "I speak of the papers as they are now shown me, and not from recollection of the events as they transpired." It is evident that the testimony of the witness merely amounts to a statement that the signature, a traced copy of which is shown him, appears to be his. But the fact of the application for, or issuance of the title, he is wholly unable to recollect. The depositions of John W. Shore and Joseph A. Hinchman have also been taken since the appeal. These witnesses testify in substance that there is now on file in the county clerk's office, at Los Angeles, a document purporting to be signed by Pio Pico, a traced copy of which is annexed to their deposition. One of them swears that he believes the signature to be genuine. The document is dated October, 1845, and the signature somewhat resembles, in the formation of the "P's" in Pio Pico's name, the signature in the case at bar. It differs from it, however, very perceptibly. It is this resemblance, such as it is, which alone gives importance to the testimony. But unfortunately it does not appear that this document is genuine. Shore testifies, April 24th, 1857, that it had been in its present custody, to his knowledge, about three years and a half. Whether it was then filed for the first time does not appear. A document filed at the end of the year 1853, with a signature resembling those now in question, cannot certainly aid the claimants. Shore, it is true, expresses his belief that the signature is genuine, but his testimony is of no greater force than if he had expressed the same belief with regard to the signatures in the papers in this case. It is but one more witness in addition to prove the genuineness of the signature. It is worthy of remark that Pio

Pico is not himself asked whether his signature to this document is genuine, although he resides in Los Angeles county, where the original is kept, and was, it is presumed, accessible.

Since the cause was submitted, the court being desirous of obtaining more full information from the archives, directed an examination of them by Mr. Hopkins, the clerk in charge. Mr. Hopkins was therefore examined by the court, with liberty to either side to cross-examine him. From Mr. Hopkins' testimony it appears that the signature of Pio Pico appears in various expedientes on file in the archives two hundred and ninety-eight times; that on the journal of the assembly it occurs one hundred and thirty-one times; and on various grants in 1845 and 1846, about one hundred times. The signatures in the expedientes, and on the journals, are remarkable for their uniformity. Those on the expedientes are exactly similar, without a single exception; those on the journals are also uniform, with the exception of a single sheet, signed "Pico." This appears to be a loose borrador, or blotter, and the signature is unlike any other that appears in the records. The one hundred signatures in the grants present the same uniformity, with some exceptions. The first is that in the case of Prudon and Vaca, hereafter alluded to. Mr. Hopkins expresses the opinion that it is a forgery. The next is a signature bearing a striking resemblance to that last mentioned. It is attached to the certificate of approval of the grant of Petaluma to M. G. Vallejo. The next is the decree of concession in case number six hundred and forty-eight, before the commission. It differs, says Mr. Hopkins, from all others that he has seen. The "P's" are made somewhat in the style of those in the present case. The remaining signatures are attached to various documents, dated from January to July, 1846. All these last differ from all others. They are all uniform and resemble each other. They differ from all others in the form of the "P's." A letter written by Pio Pico, as administrator of a mission in 1839, is also produced. The signature resembles that in the present case. No similar signature occurs later than 1839. At that time he appears to have used this last form of signature, and that previously described, indifferently. All these documents were produced in court, and submitted to inspection. From the foregoing it appears that from the beginning of his official career, up to the year 1846, throughout all the expedientes on the journals of the assembly, (with the exception of one sheet supposed to be a borrador) and in every grant, with three exceptions, Pio Pico's signature was marked by a uniform and striking peculiarity. That in grants made during 1846, he sometimes used another mode of signature; that this mode is also uniform and similar to that now used by him, as it appears on his affidavit, deposition, etc., in this case.

The three exceptions among the grants made previously to 1846, are first, that to Prudon and Vaca, which is supposed to be a forgery, and which is obviously intended to imitate his usual signature; second, another closely resembling it; and a third, differing from any other, and somewhat resembling that in this case. Of all of these numerous signatures, not one made since 1839 is found which in any respect resembles those in the grant in this case, except the solitary instance last mentioned which, as Mr. Hopkins states, differs from all others, though it somewhat resembles those in this case in the form of the "P's." It thus appears that of six hundred and twenty-eight signatures made previous to 1846, all except four are uniform. That of these four one is attached to a borrador, or blotter; the second is pronounced a forgery; the third strikingly resembles the second; the last is unlike any of the others. No one except the last resembles in any respect those in this case. It is not enough, therefore, for the claimants to show that Pio Pico had various ways of signing his name. They should prove that the mode adopted in this case was one of the modes used by him. This they have sought to do by exhibiting documents made previously to 1839, but none since. Of six hundred and thirty-nine signatures made since that time, all are uniform except fourteen, and only one bears a resemblance to those in this case. On the very day which this grant purports to have been issued, his signature appears to other grants, exhibiting its marked and uniform characteristics. In the journals of the assembly it occurs one hundred and thirty times, uniform and peculiar. It was certainly a strange accident that in this one grant he did not adopt the mode of signing which he was then, and for a long time previous had been daily using in his official transactions, but recurred to a mode of signature not used by him since 1839. All proof of handwriting except the direct evidence of those who have witnessed the act of writing is but opinion, founded on a mental comparison of the writing in question with other writing of the same party which the witness had seen. But if, as in this case, more than four hundred specimens of a signature of a party are presented, no one of which is found, except those made previously to 1839, to resemble that in question, the opinions of witnesses who pronounce it genuine from its resemblance to other signatures become of little importance. It will be urged that he did use this signature in 1839, and therefore may have used it in this instance. It is undoubtedly possible that such may have been the case, but it is in a high degree improbable that amongst so great a number of signatures marked by a uniform and striking peculiarity, he should, in this instance, have adopted a mode of signature resembling that occasionally used by him six or seven years previously. The suspicion involuntarily suggests itself, that the grant

was not made at the time it bears date. But that Pio Pico himself, or some one who has forged his name, has by mistake adopted a signature different from that which at the date of the grant, or subsequently, he was in the habit of using.

On the part of the claimants, M. G. Vallejo, Alvarado, José Castro and Salvador Vallejo testify that they are acquainted with Pio Pico's signatures, and believe those on the documents in this case to be genuine. The last witness says that he has seen Pio Pico's name to grants, and that the "P's" in the signatures to the documents are made in his usual style; he also states that Pio Pico wrote his name with uniformity. The gross inaccuracy of both of these statements will not be disputed. M. G. Vallejo states that Pio Pico made his "P's" like those in this case in his common writing. He had seen such in his grants and approvals, and common writing which he knew to be his. He cannot recollect any particular grant in which the letter is so made. The testimony of Mr. Hopkins exposes the error of this statement. Upon a grant by Pio Pico being shown to the witness, he admitted that there was no resemblance between the signature to that document and those in the case at bar, and accounts for it by the observation, "that he may have had more room in that grant, or was perhaps in a different humor." Andreas Pico swears that the signatures appear to be the true and genuine signatures of Pio Pico. That he formed his opinion by comparing them with those he has seen. That he has seen a great many in the archives. Manuel Castro, De Zaldo and Benito Diaz all express the opinion that the signatures are genuine. To this testimony may be added that of Botello, who swears that in his opinion the signatures are genuine. On the other hand, Richardson, Wm. Carey Jones, James Wilson, a former member of the land commission, and Thomas O. Larkin, all testify that in their opinion the signatures are not genuine. Orlando McKnight testifies that he has been much accustomed to examine and compare handwritings and considers himself capable of judging whether a document is written in an assumed hand. On examining the documents in this case he expresses the opinion that the signatures of Pio Pico were signed by the person who wrote the body of the instruments, that is, by Covarrubias. On comparing these signatures with seventeen signatures of Pio Pico, found in the records of the departmental assembly for 1846, he says that the letters of the name of Pio Pico in the former, as also the rubric attached, have the stiffness and clumsiness difficult to avoid in an imitation, while the seventeen signatures appear natural, easy and without restraint. On making a very close examination of the seventeen signatures with dividers, he states that he never saw a more uniform signature. J. H. Purdy, also an expert, is inclined to believe that the signatures to the document are in the same handwriting as the body of the instrument, but is not positive. On comparing these signatures with those in the record of the assembly, he says that the differences between them consist in the form of the "P's," and in that of the rubrics, also in their general appearance; that the rubrics in the record, though more condensed in width, fall farther below the line of the writing of the signature than those in the documents in this case. It ought perhaps to be added, that neither of these witnesses professes to have any familiarity with Spanish documents, or practice in comparing handwritings in that language. Col. Jonathan D. Stevenson testifies that he has corresponded with Pio Pico, and seen many documents purporting to be signed by him; that in none of them did the signatures resemble those in this case. That these last are bolder and larger than Pio Pico's usual signature, and the form of the letters, particularly that of the "P's," is unlike his genuine signature. He also thinks, from inspection, that the body of the documents and the signatures were written by the same hand, and with the same pen and ink. When asked to explain why he does not believe these signatures genuine, he says, "To use a school-boy's phrase, I think these letters were 'painted,' after they were formed. The difference is more easily pointed out than explained." I have thus recapitulated, perhaps unnecessarily, all the evidence as to the genuineness of the signatures. It is certainly not overstating its force to say that it leaves it open to the gravest suspicions—suspicions which the inspection of the originals has not tended to weaken.

At the end of the grant produced by the claimants, is the memorandum signed by the secretary, Covarrubias, stating that a note of the title had been taken in the corresponding book. This Covarrubias, in his deposition, states to have been done. The "corresponding book" is found in the archives, but it contains no note of this grant. Covarrubias swears that the book in which he entered this grant was not the one now produced. That it was not bound, but composed of sheets of paper sewed together. That in it were entered various "tomas de razon," in the handwriting of himself and of his two clerks. That he was in the habit of placing his initials "J. M. C." at the bottom of each entry. The entries for 1845, in the book now produced, are in the handwriting of Francisco Lopez, one of his clerks at that time. This statement is corroborated by the testimony of Narciso Botello. This witness swears that the book found in the archives is not that used by the government for the registry of titles at Los Angeles. That the latter was a "cuaderno," with loose leaves without binding, and generally in the handwriting of Covarrubias. He states that the writing in the last part is that of Francisco Lopez, and that on page 7 to be the writing of Don Augustin Olvera, the governor's secretary. On the oth-

er hand, Thomas O. Larkin, a witness produced by the claimants, testifies that he was acquainted with the books in the office of the secretary during the years 1845 and 1846. That there was only one book, and he believes the book produced from the archives to be the one referred to by him. That he saw this book in the secretary's office in the time of Micheltorena, and also among the archives when they were delivered over to the Americans in August or September, 1846. No other book of "tomas de razon," for 1845, is found in the archives, and the testimony of Mr. Larkin would seem sufficiently to identify it as that in which the entries for that year were made. But even admitting the accuracy of Covarrubias' statement, it is evident that as the entries are in the handwriting of one of his clerks, and the book was delivered to the Americans in 1846, among the other public records, the entries must have been made nearly cotemporaneously with their dates. It is possible, however, that they were copied from some loose sheets or "borradors," such as those spoken of by Covarrubias and Botello, and the absence of any note of this grant is not, therefore, entirely conclusive as to its genuineness. On examining this book, however, it appears that with one exception, every grant in colonization, of which the expediente is found in the archives, or which has ever been presented to the board, made from March, 1845, to December of the same year, the dates at which the entries begin and terminate, is found duly noted, as of the day on which by the memorandum on the grant the note appears to have been taken. This grant purports to be in favor of Victor Prudon and Marcos Vaca, with an informe by José de la Rosa, and a provisional license to occupy signed by General Vallejo. The expediente in this case was not found in the archives, but was deposited by the plaintiff's counsel on the ninth of February, 1852. This grant was rejected by the board as spurious. Its date is on the twentieth of December, 1845. The last entry in the book is December 23d, 1845. Admitting that it is genuine, the absence of a note of it in the toma de razon is no impeachment of the accuracy of the book. But with this exception, the entries are complete. On the very day (December 4th) on which the grant in this case purports to have been made, two other grants were made and duly entered; on the day previous, one; and another seven days afterwards. Conceding, then, that the book now found in the archives was copied from loose sheets, containing the original cotemporaneous entries, how can we account for the fact that this grant alone, of all those made during the period over which the entries extend, (with the exception above noticed) has been omitted? It is a circumstance pregnant with suspicion. It is suggested that it is possible that entries in the book now produced may have been taken from the expedientes on file; and as the ex-

pediente in this case was not on file, but returned to the party, this grant was omitted. This hypothesis is ingenious but highly improbable. It is to be borne in mind that the book now produced was found among the archives. If it be a copy of that on which the original entries were made, it was made under the former government. The borradors or loose sheets spoken of by Covarrubias and Botello have disappeared. If, then, a clerk of the former government prepared this copy, he probably did so, not from the expedientes on file, but from the borradors, which, according to Covarrubias, existed so late as the spring of 1846, when he went out of office. The fact that these borradors have disappeared, and that the book now produced alone remains, favors the hypothesis that they may have been destroyed when the copy was taken. If this be so, it is as difficult to suppose that an entry of this grant was accidently omitted, in a copy otherwise so complete and accurate, as to suppose it to have been omitted on the book in which the entries were originally made. In either case the hypothesis, if not impossible, is in a high degree improbable.

The certificate of the approval of the departmental assembly is dated December 18th, 1845. The resolution of approval appears to have passed on the eleventh of the same month. The records of the proceedings of the assembly at the close of 1845 and beginning of 1846 are preserved. They show that on the eighth of October, 1845, "The sessions of the assembly were suspended for the rest of the year, in consequence of permission having been granted to the señores deputies who reside out of this capital, to retire to the places of their residence, in view of the injuries they must suffer in consequence of their salaries due them respectively as functionaries not being paid." A publication of the foregoing in all the pueblos of the department was ordered to be made October 11th, 1845. The next session of the assembly, as shown by its journals, was on the second of March, 1846. The journals state that the governor and certain deputies, who are named, had "assembled for the purpose of reopening the ordinary sessions, which, by a resolution of the body, had been suspended for the balance of last year. Whereupon the proceedings of the eighth day of October of the last year were read and approved," etc. It is evident that no ordinary session of the assembly was held on the eleventh of December, the day on which this grant is certified to have been approved. It is contended, however, that extraordinary sessions were held, of which no record was kept, and the testimony of several witnesses has been taken to establish the fact. Juan Bandini testifies that he was elected a member of the assembly in 1846, and took his seat in the beginning of that year; that he knows that an extraordinary session was held from the eighth of October until the end of the

year 1845; that the ordinary session was commenced in the month of February, 1846, and of this he was a member. The business transacted at the extraordinary sessions related to the mission of one José Maria Hijar, and the confirmation of land titles, and granting the same. Santiago Arguello makes the same statement in almost the same language. Both repeat several times that they took their seats in the ordinary session, held in February, 1846; according to Arguello, about the first of that month. Unfortunately for these witnesses, the record of the first ordinary session of 1846 is preserved, whereby it appears, as we have seen, that the assembly resumed its ordinary sessions on the second of March, and not on the first of February; that the proceedings of the last ordinary session, to wit, that of the eighth of October, 1845, were first read and approved, and that the next business transacted was the reception of the credentials of Don Juan Bandini and Don Santiago Arguello; that the usual proceedings were on motion dispensed with; that the newly elected members were received by a committee of the body; that after making oath, as prescribed by law, they took their seats, and were congratulated by the Hon. president, who expressed his pleasure at their incorporation into the body. It is singular that both of these witnesses should have fallen into the same error with reference to a fact of which they speak so positively. It justifies the suspicion that they may also be mistaken in their statement that extraordinary sessions were held from October eighth, until the end of the year. The journals of the assembly show that secret and extraordinary sessions were held on various days between March 4th, 1845, and October 8th, of the same year. They frequently took place on the same day with an ordinary session, and the journals of the latter mention that the assembly went into secret session on the motion, etc. These secret or extraordinary sessions appear to have been not unlike the executive sessions of the United States senate, except that in some instances the proceedings at a secret session were read and approved at the next ordinary session. But the extraordinary or called sessions which are supposed by the claimants to have taken place at the end of 1845, after the suspension of the ordinary sessions for the rest of the year, are of a different character. A document is found in the archives, however, which seems to favor the idea that such may have been held. A committee, to whom a motion that the assembly dissolve itself or adjourn was referred, reports that it had no such power, as it was always in session as the council of the government; and they recommend that, after dispatching some pressing business which would come up in October, the assembly suspend its ordinary sessions for the rest of the year, and that permission be given to the deputies residing at a distance to return

home. The resolution of adjournment passed October 8th seems to have been in pursuance of this recommendation. The cause having been reopened since its first submission, the evidence of Narciso Botello was taken in court. This witness states that though he does not recollect the fact, he has no doubt that there were extraordinary sessions in 1845, for he has seen documents which show it. A document from the archives was shown to the witness, which he stated to be in the handwriting of Don A. Olvera, secretary to the governor. This document appears to be a "letra convocatoria," or summons, to the members of the assembly, to meet in extraordinary session. Whether or not the session took place the witness is unable to recollect, but he presumes, from the summons, that it did. If there were any such in December, the witness states that he must have attended them, unless prevented by illness.

From all the evidence that can be obtained, I think it not impossible that extraordinary sessions may have been held after the adjournment of the eighth of October. The cause of that adjournment, however, as declared in the resolution above cited, is somewhat inconsistent with the idea that the members immediately reassembled in extraordinary session. If they did so, the record of their proceedings has been lost by another of those unfortunate accidents which have attended this case at every step. But in addition, it is not a little remarkable that if a part of the business of this extraordinary session was the confirmation and granting of titles, no title whatever of all those granted previous to the second of March, 1846, appears to have been approved at any extraordinary session of the assembly, between its adjournment on the eighth of October, and the reopening on the second of March, with two exceptions—the grant in this case, and that of Victor Prudon, above noticed. Every other grant made subsequently to the eighth of October, and among them one dated December 4th, the very day on which this title purports to have been issued, was reserved until the ordinary session of March, and was at that session, as appears by the record, presented and approved. It is also worthy of observation, that Narciso Botello does not pretend to recollect that an extraordinary session was in fact held at the time at which it appears to have been convened—still less that at any such meeting this grant was approved. He left Los Angeles on the twenty-fifth of December. The resolution of approval was passed, if at all, on the eleventh. The grant was large, and in payment of public dues. Had he been present at any session at which it was discussed and approved, it would seem probable that he would have recollected it. His failure to do so, however, is by no means a strong circumstance against the genuineness of the certificate. It deserves, however to be noted and considered amongst the other

circumstances of the case. But the United States have produced direct testimony to prove the time and place at which these papers were fabricated. Rafael Guirado testifies that in the month of August, 1853, about nine o'clock, a. m., José de la Rosa, in company with the Messrs. Luco and Salvador Vallejo, came to the house of General Vallejo and inquired for the latter. After about two hours he came in, when they all entered his office, where they seated themselves at a table. The witness overheard their conversation, which related to "settling" the rancho of Ulpines. General Vallejo offering to put three hundred mares upon it, etc. The next day a similar interview took place, and after the rest were gone, General Vallejo said to the witness, "I am transacting some important business," and asked if he had overheard it. To which the witness replied that he had. The general, after some expressions of his confidence in the witness, proceeded to inform him of the "plan" they had arranged. "The title," he said, "we have made in the name of Rosa. It supposes a certain amount to be due him as printer at Monterey; that his brother Salvador had gone to Los Angeles and succeeded in obtaining the signature of Pio Pico to the title." The witness then said to Vallejo that the title was false, to which the general replied, "I know it. It is in this way we have planned; how can it be false, it has the signature of Pio Pico?" After some further conversation detailed by the witness, General Vallejo said in reply to an observation by the witness, that the title was void, and it would in time be discovered. "In that case it would be diamond cut diamond," and he explained this expression to mean that if there were six or seven persons to swear that the title is null (nulo) he would bring ten or twelve to swear to its genuineness. If this story be true, the character of this claim is placed beyond a doubt. Guirado has, however, been impeached by various witnesses on the part of the claimants, and sustained by perhaps an equal number on the part of the United States. It would be useless, perhaps impracticable, to attempt to decide upon a comparison of this testimony whether or not his character is such as to justify a belief in his statements. Whatever it was, whether infamous or respectable, one fact is clear, that General Vallejo, so late as March, 1855, corresponded with him on terms of friendship and intimacy. The relations which General Vallejo's letter of March 4th, 1855, shows to have existed between them, must either relieve Guirado from the imputations cast upon his character, or that of Vallejo himself must in some degree be compromised. If Guirado's testimony stood alone, and if in other respects this claim seemed fair and genuine, I should hesitate long before rejecting it on the faith of such a statement. I have alluded to it as an item of evidence entitled to consideration. It is urged that according to this story, the signatures are the genuine signatures of Pio Pico, though the document may be antedated, and it disproves the theory of the United States that they are forged. To this it may be replied, that General Vallejo may not have known, or may have been unwilling to disclose the name of the person who forged the signatures. The risk of punishment to him would be far greater than to those who merely expressed an opinion as to their genuineness, or Pio Pico may in fact have signed the document, but have forgotten to adopt the mode of signature used by him at its date.

Since the case was reopened, testimony has been taken with regard to the seals. It appears by the evidence of Wm. B. McMurtrie, that the impression or seal on the grant in this case is different, and evidently made by a stamp different from that used on the petition and the certificate of approval. The impressions on these latter are identical with those used on various expedientes and grants exhibited to the witness. Four of these were produced in court, dated at various times from April 21st, 1843, to May 2d, 1846. The impression on the grant in this case is entirely dissimilar, and the witness not only expresses the positive opinion, but demonstrates that it could not have been made with the same seal as that used on the other documents. Photographs have been taken of these impressions, and the difference is obvious on inspection. How then is this fact to be accounted for? Covarrubias swears that he recollects of only one seal being used in the office of the secretary. How happens it that the petition and certificate bear the impression of the genuine seal, while the grant has an impression of one which, if not proven not to be genuine, is not found on any other document in the archives? It is true that this fact is not specifically sworn to by any witness, but since the testimony of McMurtrie was taken, ample opportunity has been afforded to the claimants to examine the archives. If a seal similar to that on the grant could have been found, it would doubtless have been produced.

It is argued that this testimony establishes at least the genuineness of two of the seals on these papers, even though it casts a doubt on the third. But we have already seen that at the time the grant was exhibited to Covarrubias and Pio Pico to procure the affidavits on which the action of congress was founded, it was unaccompanied by either the petition or the certificate of approval. How these papers were separated from the grant, or how since reunited to it, does not appear. The difference, therefore, in the seals, tends to corroborate our suspicions that the petition and certificate may have been prepared subsequently to the grant, as they certainly did not appear in the cause until long after the production of the grant to Covarrubias and Pico. It does not appear where or in whose custody the seal of the former government now is; and if any one of the documents exhibited

bears a spurious seal, it throws a doubt upon the genuineness of them all, which is not dispelled by the fact that on two of them the seals appear to be genuine. Another circumstance is also worthy of observation. Eleven expedientes have been produced from the archives, with a view of exhibiting not only the signatures of Pio Pico, but his title or the description of his office, as contained in the headings of the grants. These expedientes are regularly numbered, and are dated at various times from November 22d, 1845, to December 19th, 1845. In all of them Pio Pico is described as "Vocal decano de la assamblea departmental y gobernador provisional de las Californias." In the grant produced in the case at bar, and in the certificate of approval, he is described as "Vocal decano de la exma assamblea del departmento de las Californias y encargado del gobierno del mismo por ministerio de la ley." · It is singular, that if this grant be genuine, the governor should in this one instance have deviated from the form which he had been using almost daily in his official acts for a considerable time, and which he adopted in three grants undoubtedly genuine, made on the very day on which this grant purports to have been issued. It is another of those extraordinary accidents which it is difficult to suppose could all have occurred by a kind of fatality, in one unfortunate case.

From the foregoing review of the evidence in this case, it is, I think, apparent that at every point it is liable to the gravest suspicion. We find that papers constituting a complete title for one of the most valuable ranchos in California have been unaccountably withheld from the board appointed to ascertain their validity, until the time for presenting them has expired, although the lands are situated in one of the most fertile and inhabited districts of the state and although all the neighbors of the grantee, including his friends and patron, General Vallejo, duly presented their claims for confirmation. We find that when the grant was submitted to counsel for inspection, and to Pico and Covarrubias for their affidavits, if indeed it was the same paper as that now presented, it was certainly unaccompanied by the petition, and almost certainly unaccompanied by the certificate of approval. That these papers have since been produced attached to the grant, but when and by whom we know not. That the petition is found, not in the archives, which was the legal and usual place of custody, but in the possession of the party, though the secretary of the government has no recollection of ever having withdrawn any expediente from the archives, nor does he remember sending any document whatever to the grantee in this case. How, and why, and when, and by whom this petition was obtained from the archives, we are wholly uninformed, except by the statement of De la Rosa that it was delivered to him by Vallejo, which the latter denies. Why and how it became sep-

arated from the grant is likewise unexplained, as is also the singular fact that, having this petition in their possession, the claimants should have procured from Covarrubias the affidavit stating that he did not know where it was, and "that the practice was to return the petition with the grant." If it was not then in the claimants' possession, where was it? In whose custody? And how and whence has it been procured? We find also that the pretended occupation by De la Rosa of this land has been disproved by so great a preponderance of evidence as to suggest the most painful suspicions. We find the archives not only failing to exhibit any trace of the existence of the grant, but unless a series of extraordinary accidents be supposed, absolutely disproving its existence. We find that the signatures of the governor, though sworn to as genuine, are by many disinterested witnesses declared to be forgeries; while the governor himself testifies with caution and reserve, and is wholly unable to recollect a single circumstance connected with the grant. We find that in the opinion of many respectable persons, the characters of the principal witnesses for the claimants are such as to render them unworthy of belief. And finally, we find the suspicions of the fraudulent character of this claim, so vehemently excited by every circumstance attending it, are confirmed by the detailed and circumstantial disclosure by a witness who, whatever his character, was certainly in the confidence of General Vallejo, of the time and place and manner of its fabrication.

Such an array of proofs I confess myself unable to resist. But in addition: To hold this grant genuine we must suppose that by some unexplained accident, and contrary to custom, the petition was delivered to the party—that it remained with the grant in his possession, unseen by any one, and unsuspected by almost all of his neighbors and intimate associates. That the owner of so valuable an estate was content to remain a dependent upon the bounty of a wealthy friend, or to obtain a livelihood by mending clothes and similar employments, and never himself thought, or was reminded by his friend, of the necessity of presenting his title for confirmation. That he has frequently and without a motive declared that he never obtained any grant whatever. That the petition, the grant, and the certificate of approval, though together in the possession of the grantee, were by some unexplained accident separated when he transferred his title to the claimants. That the first and the last documents, after disappearing for a time, were in some unexplained way recovered, and reunited to the grant after the papers had been submitted to counsel and affidavits to be laid before congress had been procured. We must further suppose that the note of the grant was taken in a book which has disappeared. That in the book which remains, and is by one witness

identified as the book in which titles were noted, a note of this grant was by some strange accident omitted, although every other grant issued during the period over which the record extends is found duly noted. We must suppose that in this instance, almost solitary, the governor made an extensive grant without requiring a single report or informe, and has entirely forgotten the circumstance. We must further suppose, that the departmental assembly held an extraordinary session, of which their journals contain no trace, and this after a formal adjournment for the rest of the year, and after permission given to the members to return home. That the journal of their proceedings on reassembling alludes to the fact of their previous adjournment for the balance of the last year, and shows that the reading and approval of the proceedings of the last ordinary session was the first business transacted, while all mention of the supposed extraordinary sessions in the interval is omitted. We must further suppose, that all the grants issued in the interval between the adjournment on the eighth of October, and the reassembling on the second of March, were reserved by the governor until after the ordinary sessions had recommenced, with the exception of this grant and one other rejected by the board as spurious. We must suppose that the governor—although his name appears to public documents of various kinds, signed with singular uniformity several hundred times—in this instance adopted a mode of signing, either never on any other occasion made use of by him on official documents, or long disused. And this, notwithstanding that on the very day on which this grant was signed, as well as before and afterwards, his signature appears on various documents, exhibiting the same uniform and striking peculiarities visible throughout all the records of his official action. We must suppose that the seal used on this grant is genuine, though it was not only different from that used on the petition of the eighth of November, and from that on an expediente of the nineteenth of December, but different from any elsewhere found in the archives, and this without proof that there was more than one seal, and in the face of the declaration of the secretary that there was but one. And finally, that a wretch has been found with intelligence and depravity enough to invent and swear to a detailed and circumstantial account of the fabrication of these documents. Such a series of improbable hypotheses I have found it impossible to believe. I have given to this case an unusual degree of labor and attention, and have endeavored to arrive at a just and impartial conclusion. My conviction is that it ought not to be confirmed.

[Affirmed on appeal in 23 How. (64 U. S.) 515.]